## UNITED STATES v. 10,064.97 ACRES OF LAND, MORE OR LESS, IN CROOK COUNTY, WYO. et al.

### Civ. No. 3387.

United States District Court
D. Wyoming.
April 9, 1952.

J. J. Hickey, U. S. Atty. of Cheyenne, Wyo., and Andrew J. Murphy, Jr., Lands Division Atty., United States Department of Justice, of Louisiana, Mo., for plaintiff.

H. F. Fellows, of Rapid City, S. D., Pat Morrison, of Mobridge, S. D., and George F. Guy, of Cheyenne, Wyo., for defendant landowners.

T. BLAKE KENNEDY, District Judge.

The above entitled proceeding is one for condemnation of land by the government through its Reclamation Department for the purpose of constructing a dam to constitute a reservoir of what is known as the Keyhole Unit in Crook County, Wyoming. The matter is before the Court at the present time upon exceptions to the report of Master-Commissioners duly appointed for fixing the compensation to be paid the landowners whose land had been taken for the aforesaid purpose under a declaration of taking on June 6, 1951. The proceeding was instituted on the last mentioned date and subsequently answers were interposed by some of the landowners indicating their objection to the amount fixed by the government as the value of such properties in the declaration of taking and asking that the compensation be fixed in the manner provided by law. The government made in writing a demand for jury trial. Thereafter the government made application to the court for the appointment of Commissioners to appraise and ascertain the just compensation to be paid the landowners and the Commissioners so selected by the government were appointed by order of the Court. Subsequently thereto Rule 71A of the Federal Rules of Civil Procedure, 28 U.S.C.A., came into being which provided for a jury trial (unless the Court in its discretion should order that because of the character, location or quantity of the property to be condemned, or for other reasons, in the interest of justice, the issue on compensation should be determined by a commission of three persons appointed by it). Counsel for the landowners then made application to the Court that Master-Commissioners be appointed under said rule. Without at least a great deal of opposition on behalf of the government the Court determined and used its discretion in appointing such Master-Commissioners and the same three men, who were previously selected by the government as Commissioners to appraise and fix the compensation were, without opposition on behalf of the landowners, appointed such Master-Commissioners. Said Commissioners were given instructions by the Court, the original of which was marked Exhibit "A", directed to be filed in the record, and a copy given to such Commissioners. A time was then fixed for said Master-Commissioners to sit and hear the evidence supporting the claims of the government and the landowners. A court reporter was provided for and counsel for the parties attended the hearing and presented the evidence for their respective parties. Such evidence covered substantially one thousand pages of testimony. Subsequently the Master-Commissioners filed their unanimous report fixing the compensation to be allowed the respective landowners whose property values were in dispute. After filing said report the government, through its counsel, filed exceptions thereto, which, at a day fixed, were presented to the Court through oral argument by counsel for the respective parties. So much for a general outline of the history of the case bringing it up to the point for a decision of the Court.

Under Rule 71A it is provided that if a Commission be appointed it shall be governed by the provisions of certain paragraphs of Rule 53 and particularly paragraph 2 of subdivision (e) of that rule, the first sentence of which reads as follows: "In an action to be tried without a jury the court shall accept the master's findings of fact unless clearly erroneous." Under this set-up it seems to be the duty of the Court to determine whether or not the Master-Commissioners have followed the instructions of the Court as to the admissibility and consideration of testimony offered and if it be found that they have not overstepped the rules and regulations in this respect their report should be approved, if under these circumstances it could not justly be found to be "clearly erroneous".

The exceptions filed to the report, consisting of nine in number, are all generally along the same line to the effect that the findings of the Master-Commissioners are excessive, outside the range of testimony, and against the weight of evidence; that in certain instances two ranches have been erroneously considered as one unit and generally in all exceptions presented, that the Commissioners were acting upon some information which they received from some place completely outside any evidence that was introduced at the trial.

No trial briefs (except one as to certain phases of law) were filed but several points upon oral argument were emphasized by counsel for the government in attempting to sustain their exceptions. Inasmuch as there was a sharp dispute between opposing counsel as to what the evidence really was upon these points the Court reluctantly undertook the burden of reading the entire testimony produced before the Master-Commissioners consisting, as before stated, of approximately one thousand pages in order to attempt at least a more intelligent ruling on the points presented.

 One of the points asserted by counsel for the government is that the Commissioners entirely ignored the matter of comparable sales of properties in the vicinity of the lands taken by the government and in this respect counsel assert that the Commissioners violated the instructions of the Court. This comes within the purview of instruction No. 18, which deals with the matter of arriving at a market value, in which it is stated: "One way to arrive at a fair market value, or a market value, is to take examples of sales in the community where the property is situated of land which is similar to that which is in controversy, and it is also said that a fair way to arrive at the market price is to determine what a purchaser is able and willing to pay and what a seller who is not forced to sell is willing to sell for." This rule I think is one which is generally recognized by the courts as being probably the most available rule to determine the fair value of property. However, it leaves within the discretion of the Master-Commissioners, or of a Court, or of a jury, to determine whether or not the so-called sales of similar lands are fairly comparable with the lands to be valued. There were some evidences of sales introduced by the landowners themselves in which the grazing lands did not greatly differ from that fixed by the witnesses for the government, but as to the so-called bottom lands upon which improvements, crops, irrigation and roads were indicated, there was a great disparity in the valuation fixed. After reading the evidence I think there is a fair inference that the Commissioners may have reasonably considered that the evidences of the sales of land which were introduced to be shown as similar were not comparable as ranching units in many instances as to size, location, improvements, making up what has been described in the testimony as "balanced ranches". In this respect, many elements were taken into consideration, such as carrying capacity, productivity, improvements, consisting of houses, barns, corrals, fences, and the like, irrigation facilities, private roads, shelter facilities, capacity for raising hay, alfalfa and other crops, proximity to markets, schools, churches, public highways, and shipping points. All of these elements are undoubtedly proper to be considered in fixing price valuations, which would give justification to the Commissioners in considering all proofs as to whether or not the sales of certain lands in the community were comparable with those under consideration. While the rule of the courts is generally that the evidence of sales of lands in the community not under forced conditions is usually considered the best evidence, it cannot be made absolutely a binding rule on Commissioners, juries or courts, so as to take away from them the right to determine what the comparable conditions are. In short, I find nothing in the evidence which justifies the conclusion that they transcended or violated any instruction of the Court in this respect.

Another contention of the government is that the landowners attempted to build up in connection with their testimony concerning improvements the reconstruction value of such improvements, which is not allowable, and the value of any improvements

must of course be merged into the entire value of the acreage taken. Some of the proofs on behalf of the landowners as to buildings would indicate with figures what their value was at the present time but it was not claimed by the landowners that they were attempting any thought of reconstruction values but only evidence which went to the point of indicating what the improvements were, their general condition, with the view of ascertaining something of their value. In other words, whether a dwelling on a ranch was merely a "tumble-down shack", as distinguished from a reasonably comfortable and adequate ranch house. The evidence presented clearly comes within the scope of instruction No. 10, which was agreed upon by counsel, which states that "although evidence is receivable touching the value of the land with and without the buildings thereon, the probable cost of reproducing such buildings and the extent of depreciation and obsolesence, having regard to the present actual condition of said buildings, nevertheless the duty of the Commission is to determine and appraise the present fair market value of the land with the buildings thereon as an entire property". In viewing the testimony in the light of this instruction I cannot say that the Commission acted outside its reasonable bounds.

Another point of disagreement among counsel is as to what has been called "severance value". That is, land not actually taken but severed from the lands so taken in such a way as to reduce the value of such severed lands. A considerable portion of the award of the Master-Commissioners is made up of this element. The testimony of the landowners strongly supports the contention that on a balanced ranch the outside lands used for summer pasture are of great value to the main ranch, especially in fixing its productivity. In this respect instruction No. 9 seems to cover the situation where it is stated: "But, where there is an entire property such as a farm, and only part of the entirety is taken, the commission in assessing the just compensation shall take into consideration not only the physical property actually taken title to by the government, but the effect of that taking upon the remainder that it left to the owner. That is to say, you first take the fair, reasonable market value of the entire tract or farm at the time of the taking, and then determine the fair reasonable market value of the part remaining after the government has taken away the part condemned, and the difference between the two would be the just compensation to the owner for that part taken by the government." There was evidently a difference of opinion among the witnesses for the government and the landowners as to whether certain parcels of land claimed as a part of the ranch unit really came within the classification mentioned but the evidence on behalf of the landowners was adequate to sustain the findings of the Commissioners along this line. There is one exception in this respect that appears, I believe, in the tract known as No. 7–F and 7–R, known as the Bertha Waymire and Emmaline E. McKean tract, which tract was given severance value to some land which was not wholly owned by the owners of the original tract. As I understand the rule, there must be a common ownership in this respect and therefore the severance value allowed by the Commission for lands not wholly owned by the same owner whose land was taken should not have been allowed and it will be eliminated from the award.

As to the exception that the findings indicate the Commissioners were acting completely outside the evidence in making their award, I find nothing in the testimony which justifies this conclusion and as a matter of fact, on many of their valuations, they made a considerably smaller award than would have been possible under the evidence offered by the landowners. In addition to this, there has been no attempt evidently to impeach the honesty and integrity or intelligence of the Commissioners, nor any specific showing in the testimony or otherwise that they were influenced by attempting to favor the landowners because they were acquaintances and neighbors. There were allusions in the oral argument to the fact that the witnesses for the landowners were friends and neighbors and therefore biased and

prejudiced in their favor, which would be a proper element to consider, but on the other hand largely the principal witnesses for the government were paid employees of the government who might be as likely to be prejudiced in the government's favor. In any event, as far as I could find from reading the testimony, all the witnesses on both sides appeared to be honest and conscientious men and women, some of course better equipped than others to testify on the points involved, which is always the case in any kind of litigation.

Another point in controversy is the so-called "flood easement" or "flowage easement" which concerned lands which were not taken in fee but might some time presumably be overflowed, with damage to the owner. In this respect testimony was offered by the government tending to show that these flood conditions would recur infrequently, sometimes only as often as twenty-five years or sixty-two years, and that therefore the value fixed for these lands was highly excessive. The testimony of the landowners, however, was to the effect that with such an easement there would be a cloud on the title of these lands which would make it impossible for them to have a market value. No one would feel justified in putting improvements on such lands if there was danger of them being destroyed or wiped out by one of these floods. It seems to me that the Commission might well have taken into consideration in assessing values on such lands that they would be greatly diminished by cloud on the title in the event they should be flooded, although infrequently. The owner, in the event of flood, would be entirely without recourse for any damages which he sustained because there would be a perpetual flood easement which would relieve the government for all time to come.

■■ One of the points to consider as set forth in the exceptions is that the values fixed by the Commission are excessive. The Court's reaction to this characterization is that the valuations do seem high but it is not the province of the Court to determine the valuations but simply to determine whether or not they are outside the scope of the evidence offered. The

difference in the testimony in range on acreage values varied considerably. The average acreage value by the landowners in most of the tracts was around $37.50, while that of the government witnesses varied from $12 to $25 per acre. Both sets of witnesses testified as to the method of their arrival at the acreage value by attempting to separate the bottom lands and the grazing lands. The greatest disparity in values occurred with relation to the so-called bottom lands which contained all ranch improvements, including buildings of all kinds, meadows, crops, irrigation ditches, shelters, roads and fences, which landowner witnesses fixed around $200 per acre, while some government witnesses fixed these at as low as one-third of that of the former witnesses, wherein probably lies the substantial differences in the final result of computations, but under these circumstances it does not seem to me to be within the province of the Court to substitute its judgment for that of the Commissioners as to which valuation they should have adopted. In this respect I think it is at least pertinent to take into consideration that the government is seeking to condemn this land at a time when the so-called stock-raising business is at its peak and as a corollary thereto, the so-called landowners are receiving income from their respective ranches when the prices of livestock are at a peak. There is evidence in the record tending to show that steers are now bringing in excess of $300 per head and ewes, $40 per head. This necessarily means that the facilities to produce these animals must similarly be of greater value than under other circumstances and conditions and strongly suggests that the price of land and other facilities which enter into the livestock business would naturally increase with the market value of the products. Under such circumstances it is difficult for the Court to conscientiously say that the prices fixed by the Commission are excessive.

■ Three smaller tracts which have not heretofore been discussed but which probably were before the Commission to determine are one known as 4–R, owner, J. H. Altaffer; one 12–F, owner, Clifford E.

Sward; and one 21–F and 21–R, owner, Oscar J. Peterson. In respect to these tracts the Commissioners increased the estimated compensation. In the 4–R tract the estimated compensation was $240 and the only proof offered was by the government that its value was $240, yet the Commissioners' award was $495. I find no basis for this increase unless it was submitted in some other form which does not appear in the testimony, so that the valuation testified to of $240 should be the amount fixed. In the 12–F tract, Clifford E. Sward, the estimated compensation was $90 and the Commissioners' award was fixed at $100. I find no testimony fixing the valuation of this tract and while counsel for the other landowners originally appeared for this owner they stated on the hearing that they were not interested. There being no evidence upon the value in the testimony, the estimated compensation of $90 should govern. As to the tract 21–F and 21–R, Oscar J. Peterson, there was no appearance on behalf of Peterson and no evidence offered as to the value of his lands, so far as the record reveals. The estimated compensation was $200 but the Commissioners made an award of $370. Unless there is some other evidence in the record as to value, the estimated compensation of $200 should govern and these three awards should be amended accordingly. These tracts were evidently before the Commissioners for the purpose of fixing valuations as they appear specifically in their report and it may be reasonably assumed that they thought it was their duty to fix some valuation on the property and they did so. I cannot see, however, that this has any particular connection in the general character of the Commissioners' awards upon those tracts where evidence was offered.

So far as the recollection of the Court goes the principal points discussed by counsel in the oral argument based upon the exceptions have been discussed. It remains to formally record the conclusions of the Court in accordance with the views expressed in this memorandum. Inasmuch as this is not a Court tried case, in the strict sense, it would seem that specific findings of fact and conclusions of law under the

rules would not be required unless it is desired by counsel. However this may be, an appropriate order and judgment must be submitted in specific amounts, which duty will be placed upon the counsel for the defendant landowners, but in collaboration with counsel for plaintiff, on or before April 25, 1952, reserving such exceptions to both parties as may be desired and the Clerk will enter an order accordingly.